UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 24-cr-10071-FDS |
| | ) | |
| ERIC NSHIMIYE, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S OPPOSITION
## TO DEFENDANT'S MOTION TO SUPPRESS

On March 11, 2024, two Special Agents and a Task Force Officer from Homeland Security Investigations ("HSI") interviewed the defendant in a conference room at the Goodyear Tire & Rubber Company in Akron, Ohio, where the defendant worked as an electrical engineer. The agents asked the defendant if he was willing to answer questions—he said he was—and told the defendant he could stop answering questions at any time. The subsequent conversation was casual and non-accusatory. After approximately eighty minutes, the agents thanked the defendant and he left.

Against this backdrop, the defendant's Motion to Suppress presents two straightforward issues: *First*, would a reasonable person in these circumstances have believed he was free to terminate the interview? And *second*, were the defendant's statements voluntary within the meaning of the Due Process Clause of the Fifth Amendment?

The answer to each of these questions is *yes*. The familiar setting of the interview, the duration of the interview, and the agents' conversational tone and demeanor, and other relevant factors amply support a finding that the interview was non-custodial and that *Miranda* warnings were not required. Likewise, the relevant facts and circumstances establish that the defendant's statements were voluntary. Although the agents employed a standard ruse to begin the interview, that alone is legally insufficient to establish

1

involuntariness.  The Court should deny the defendant's Motion to Suppress accordingly.

### Relevant Facts[1]

In 2018, the defendant testified as a defense witness in the trial of *United States v. Jean Leonard Teganya*, Case No. 17-cr-10292-FDS.   In the wake of the Teganya trial, believing the defendant had perjured himself by lying about his activities in Rwanda before and during the genocide in 1994, HSI began investigating the defendant for possible immigration fraud and other offenses.  That investigation culminated in the defendant's arrest on March 21, 2024.  He was later indicted and charged with obstruction of justice, perjury, and perpetrating a decades-long scheme to conceal his involvement in the 1994 genocide.

For approximately twenty-three years prior to his arrest, the defendant worked as an engineer at the Goodyear Tire and Rubber Company ("Goodyear") in Akron, Ohio.  On March 11, 2024, two special agents and a task force officer from HSI interviewed the defendant at Goodyear's offices in Akron.  The defendant was escorted to the interview room—an interior conference room—by his supervisor.  However, only the defendant and the agents participated in the interview.  The conference room door was closed but not locked throughout the interview, which was audio recorded.  The defendant was seated closest to the door.

After introducing themselves, the agents told the defendant they were conducting outreach to the Rwandan community to gather information about the recent death of a Rwandan genocide survivor in California.  ECF No. 133-3 at 2-3.  In fact, the purpose of the interview was to question the defendant about his whereabouts and activities before and during the 1994 genocide in Rwanda.  The agents apologized for approaching the defendant at work, explained that people sometimes get "upset" when agents "go to people's houses," and told the defendant their conversation was "private."  *Id.* at 3.  The

---

[1] These facts are derived from the interview recording and other discovery produced in this matter.  To the extent any of these facts are in dispute, the government will establish them at an evidentiary hearing.

agents also told the defendant that his participation in the interview was voluntary:

> Special Agent:    So with that being said, as we speak to the individuals from Rwanda in the Ohio community, one of the things that we let them know is that all of our outreach and conversations with people have to be consensual.  Okay.  So you have to be willing to participate with us. This is in no way a situation where we're forcing you to talk or do anything like that.  But it's one of those things that has to be consensual.  And if you're willing to just have a chat with us, we're willing to, we'd love to get a better insight into Rwanda if that's possible.

> Defendant:    Okay.

> Special Agent:    Is that okay?  I know you're still kind of, you seem a little bit confused.  How about this?  How about I start with the, with the understanding that if any of the situations that we're talking about here that took place that you're not comfortable answering any questions, you don't have to answer questions.  Okay?

> Defendant:    Yeah, yeah.

> Special Agent:    We'll go with that.

*Id.* at 3.[2]  Told that he could stop answering questions at any time, the defendant agreed to proceed.

The interview lasted approximately eighty minutes.  Roughly nineteen minutes into the interview, the agents began questioning the defendant about his background, how he came to the United States, and about his whereabouts and activities immediately before and during the genocide.  Among other things, the defendant denied being a member of the National Revolutionary Movement for Development or "MRND" (the ruling Hutu political party in Rwanda from roughly 1975 to 1994) or the interahamwe (the youth wing of the MRND).  *Id.* at 30-31.  He also denied being present in Butare (where he had been a student) during the genocide, claiming instead that he fled from Kigali to the Democratic Republic of the Congo and later to Kenya.  *Id.* at 9-10, 31-32.  Although they suspected he was being untruthful, the agents

---

[2] The interview transcript attached to the defendant's motion (ECF No. 133-3) appears to have been generated via AI and contains numerous inaccuracies.  This portion of the transcript—where the agents explained that the interview was voluntary—omits several remarks made by the defendant that are relevant and plainly audible in the recording (ECF No. 133-4).

did not confront the defendant or accuse him of wrongdoing (either in Rwanda or the United States). Instead, the agents thanked the defendant, and he left the interview room.

## **Argument**

I.   ***Miranda*** **Warnings Were Not Required Because a Reasonable Person Under the Circumstances Would Have Believed He Was Free to Terminate the Interview.**

It is well established that law enforcement officers must give *Miranda* warnings before interrogating an individual who is "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California,* 511 U.S. 318, 322 (1994) (internal quotation marks omitted).   In the absence of a formal arrest, whether an individual is in *Miranda* custody depends on whether there is a "restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer,* 559 U.S. 98 (2010) (internal quotation marks omitted).  The determination involves two distinct inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."   *Thompson v. Keohane,* 516 U.S. 99, 112 (1995).

Although the inquiry into whether an individual is in custody for purposes of *Miranda* is one of the totality of the circumstances, courts have identified several relevant factors including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. O'Neal*, 17 F.4th 236, 241 (1st Cir. 2021) (internal quotations marks omitted).  "The determination of whether custody exists depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (internal quotations omitted).

Considering all the relevant facts and circumstances, a reasonable person would have felt free to

terminate the interrogation and leave the interview room. To begin with, the defendant was interviewed in a conference room at his place of employment of more than twenty years – at worst, a neutral setting. *O'Neal*, 17 F.4th at 239-240 (finding two-and-a-half-hour interrogation in enclosed conference room at defendant's workplace was non-custodial); *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) (same); *United States v. Lazarus*, 552 Fed. Appx. 892, 894 (11th Cir. 2014) (defendant not in custody when interviewed "at a neutral location, an office at her workplace"). At the very outset, the agents told the defendant the interview was voluntary and that he was free to terminate the encounter at any time. The defendant indicated he understood. *See Lazarus*, 552 Fed. Appx. at 894 (defendant not in custody where agents "readily agreed to end the interview" when asked). Although the conference room door was closed, the door was not locked, and the agents did not exercise physical control over the defendant or direct his movements in any way. *O'Neal*, 17 F.4th at 241-42 (concluding a lack of restraint by interviewing officers suggested interview was not custodial even where "the door to the conference room [where the interview took place] was closed"). Moreover, the defendant was seated closest to the door throughout the interview, further suggesting he was free to leave the room at any time. *United States v. Mshihiri*, 816 F.3d 997, 1004 (8th Cir. 2016) (defendant not in custody where defendant "entered the interview room voluntarily and was seated closest to the door throughout the questioning").

The length of the interview—approximately eighty minutes—was reasonable and likewise supports the conclusion that the interview was not custodial. The First Circuit has previously described a ninety-minute interview as "relatively short," *Hughes*, 640 F.3d at 437, while also finding that a two-and-half-hour interview was not custodial where—as here—the "tone of the conversation was relatively calm and nonthreatening." *O'Neal*, 17 F.4th at 241; *see also United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011) (noting "calm and nonthreatening prearrest interaction" suggested it was not custodial). While the defense characterizes portions of the interview as "confrontational" and "accusatory," the audio recording easily belies those characterizations. The agents politely asked the defendant about his political

affiliations in Rwanda and about his whereabouts and activities during the genocide but never accused him of doing anything improper or said they suspected him of lying.  This lack of confrontation is yet another indication of a non-custodial interview.  *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (concluding that a non-accusatory, "cordial" questioning suggested interview was non-custodial).

The presence of three law enforcement officers does little to change the analysis.  The First Circuit has "previously declined to find that a defendant was in custody even when confronted by as many as *five* police officers." *United States v. Swan*, 842 F.3d 28, 32-33 (1st Cir. 2016) (citation omitted) (emphasis added); *see also O'Neal*, 17 F.4th at 241-42 (finding presence of three officers insufficient to establish custody); *United States v. Infante*, 701 F.3d 386, 397 (1st Cir. 2012) (finding no custody where "two officers were in the room, joined briefly by two others"); *United States v. Melo*, 954 F.3d 334, 340 (1st Cir. 2020) (finding suspect was not in custody although two armed officers were present for questioning with two additional law enforcement personnel on scene).  Moreover, in addition to their calm and professional demeanor, the presence of the three officers here was blunted by the fact that they wore plain clothes and never displayed or even alluded to their firearms.  *See Hughes*, 640 F.3d at 436 (finding interrogation non-custodial even where officers "carried visible weapons" which "remained in their holsters throughout the visit").

That the agents never expressly told the defendant he was "free to leave" does not render the interview custodial *per se*.  Indeed, courts in the First Circuit and elsewhere have routinely found interviews to be non-custodial even where the suspect was not explicitly told he was free to leave provided other factors—the length and character of the interview, among others—suggest a non-custodial encounter.  *See, e.g.*, *Hughes*, 640 F.3d at 437 (ninety minute interview by four officers was not custodial even though defendant "was never explicitly told that he was free to terminate the interview" or that he did not have to answer questions where officers did not restrain defendant and interview was "relaxed and nonconfrontational"); *United States v. Lanni*, 951 F.2d 440 (1st Cir. 1991) (concluding four-hour

6

interview was not custodial even thought defendant was never told she was "free to leave" or terminate the interview); *United States v. Ashworth*, 678 F. Supp. 3d 208, 219 (D. Mass. 2023) (concluding defendant not in custody despite never being told he was "free to leave" where officers did not restrain defendant or direct his movements); *United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015) (affirming no custody finding even though defendant was never told he was "free to leave"). Considering the interview setting, the character and length of the interview, the lack of physical restraint, and the defendant's expressed willingness to answer questions, it is of little consequence that the agents did not tell the defendant he was "free to leave."

In sum, the totality of the circumstances establish that a reasonable person would have felt free to terminate the interview. The interview occurred in a neutral setting (the defendant's place of work); the officers told the defendant that the interview was voluntary and that he did not have to answer questions, and he agreed to proceed; the interview was conversational, non-accusatory, and reasonable in length; and the interviewing agents did nothing to restrict or direct the defendant's movement. Accordingly, the Court should find that the interview was non-custodial and that *Miranda* warnings were not required.

## II.    The Defendant's Statements Were Voluntary Within the Meaning of the Due Process Clause.

The defendant argues that the tactics employed by the agents during the interview and the involvement of the defendant's employer amounted to a "potent form of coercion" that rendered the defendant's statements involuntary. In support of this proposition, the defendant cites a single case: *Garrity v. New Jersey*, 385 U.S. 493 (1967). In *Garrity*, the appellant police officers were given a choice: either answer questions that could incriminate them or refuse to answer and be subject to removal from office. *Id.* at 494. The defendant here faced no such choice. Although his employer escorted him to the conference room where the interview took place, no one from Goodyear was present during the interview. Once the interview began, the agents apologized for approaching the defendant at work and told him the

7

interview was private:

> *And one of the reasons why we came to your work today is because what we found over the last few months is that when we go to people's houses, they get kind of upset. So I hope it's okay that we're here. We knew that you worked here. It's a private conference room and all that good stuff.*

Next, the agents told the defendant that "[t]his is in no way a situation where we're forcing you to talk or do anything like that," that the interview "has to be consensual," and that "[if] you're not comfortable answering any questions, you don't have to answer questions." Unlike *Garrity*, therefore, there was no threat—actual or implied—that his refusal to answer questions could have adverse employment consequences. The interview merely occurred at the defendant's place of employment with his employer's knowledge – facts that are insufficient to support a finding of involuntariness.

There is likewise little support for the defendant's claim that the agent's conduct during the interview was improperly coercive. Coercive conduct sufficient to render a statement involuntary typically must include threats of retaliation, threats of violence, or evidence of consciously misleading conduct on the part of federal agents. *United States v. Flemmi*, 225 F.3d 78, 92 (1st Cir. 2000) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); *United States v. Rosario–Diaz*, 202 F.3d 54, 69–70 (1st Cir. 2000). According to the First Circuit, however, law enforcement "trickery" is not "automatically coercion," and it would be "very hard [in light of the Supreme Court's decision in *Colorado v. Connelly*[3]] to treat *as coercion* a false assurance to a suspect that he was no in danger of prosecution." *United States v. Boskic*, 545 F.3d 69, 78 (1st Cir. 2008) (emphasis original). Thus, although "trickery can sink to the level of coercion," this is a "relatively rare phenomenon." *United States v. Flemmi,* 225 F.3d 78, 91 n. 5 (1st Cir. 2000).

Here, the agents told the defendant the purpose of the interview was to inquire about the suspicious

---

[3] In *Connelly*, 479 U.S. 157 (1986) the Supreme Court held that "only confessions procured by coercive official tactics should be excluded as involuntary," modifying the previous common law rule that "confessions produced by promises not to prosecute or offers of lenience were often excluded as involuntary." *See United States v. Boskic*, 545 F.3d 69, 78 (1st Cir. 2008).

death of a Rwandan genocide survivor in California when, in fact, the agents were investigating the defendant.  The First Circuit has found that similar law enforcement ruses—in essence, misrepresenting the purpose of the interview to put the defendant at ease—do not, without more, constitute law enforcement coercion.  For example, in *United States v. Boskic*, 545 F.3d 69 (1st Cir. 2008), agents were investigating whether the defendant had committed fraud by lying in immigration documents about his miliary service during the Bosnia war.  In furtherance of their investigation, FBI agents orchestrated an immigration interview as a ruse to question the defendant about his military service.  *Id.* at 72.  According to the First Circuit, "[a]lthough the fact that the agents allowed him to believe he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary."  *Id.* at 80.  In further support of its finding that Boskic's statements were voluntary, the court noted that the interview was "not particularly lengthy," that Boskic was "never subject to physical discomfort," and that he was "a well-educated, mature adult of forty years, who had a general familiarity with the American legal system and was in good mental and physical health."  *Id*. at 80-81.

The same can be said of the defendant and his interview.  According to *Boskic*, the agents' deception alone "did not make [the defendant's] statements involuntary," 545 F.3d at 80, and the other relevant facts and circumstances do not support the defendant's argument.  As in *Boskic*, the defendant was an intelligent, middle-aged adult in good physical and mental health, who had resided in the United States for more nearly thirty years at the time of the interview.  The interview itself was reasonable in length (shorter, in fact, than the *Boskic* interview) and the defendant was not "subject to physical discomfort."  The defendant was told that the interview was voluntary and that he did not have to answer questions. Considering these facts, the court should conclude that the defendant's statements were voluntary.

## Conclusion

For the foregoing reasons, the government respectfully asks the Court to deny the defendant's Motion to Suppress.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Jason A. Casey*
Jason A. Casey
Christopher Looney
Assistant U.S. Attorneys

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Jason A. Casey*
Jason A. Casey
Assistant U.S. Attorney